NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
JERRY C. YANG
Assistant United States Attorney
Chief, Riverside Branch Office
JULIUS J. NAM (California Bar No. 288961)
Assistant United States Attorney
Deputy Chief, Riverside Branch Office
    3403 10th Street, Suite 200
    Riverside, California 92501
    Telephone:     (951) 276-6942
    Facsimile:     (951) 276-6202
    E-mail:        julius.nam@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ED CR No. 18-200-SVW-1 |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT LISA KAY CAMP |
| v. | Sentencing Date:  10/19/2020<br>Sentencing Time:  11:00 a.m.<br>Location: Courtroom of the<br>        Hon. Stephen V. Wilson |
| LISA KAY CAMP, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Julius J. Nam, hereby files its sentencing position for defendant LISA KAY CAMP. The government's sentencing position is based upon the attached memorandum of points and authorities, the files and records in this case, the Presentence Investigation Report submitted by the United States Probation Office, and any other evidence or argument that the Court may wish to consider at the time of sentencing.

The government respectfully requests the opportunity to supplement its position or respond to defendant as may become necessary.

Dated: October 7, 2020

Respectfully submitted,

NICOLA T. HANNA
United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

JERRY C. YANG
Assistant United States Attorney
Chief, Riverside Branch Office


   /s/
JULIUS J. NAM
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION..................................................1

II.   DEFENDANT'S OFFENSE CONDUCT...................................1

III.  THE PRESENTENCE INVESTIGATION REPORT..........................4

IV.   THE GOVERNMENT'S SENTENCING CALCULATIONS AND
      RECOMMENDATIONS...............................................5

      A.   "MORE THAN 10 VICTIMS" ENHANCEMENT.......................6

      B.   OBSTRUCTION OF JUSTICE ENHANCEMENT.......................6

      C.   AGGRAVATING ROLE ENHANCEMENT.............................7

      D.   STIPULATED RESTITUTION AMOUNT...........................10

V.    ARGUMENT.....................................................12

      A.   LEGAL STANDARD..........................................12

      B.   DEFENDANT'S OFFENSE AND PERSONAL HISTORY,
           § 3553(A)(1)-(2).......................................13

      C.   RESPECT FOR THE LAW, PROTECTION OF COMMUNITY,
           DETERRENCE, AND AVOIDANCE OF UNWARRANTED DISPARITIES,
           § 3553(A)(3)-(7).......................................13

      V.   CONCLUSION..............................................14

**TABLE OF AUTHORITIES**

**CASES**

United States v. Avila, 95 F.3d 887 (9th Cir. 1996)................10

United States v. Cantrell, 433 F.3d 1296 (9th Cir. 2006)..........15

United States v. Cefaratti, 221 F.3d 502 (9th Cir. 2000)..........12

United States v. Garcia, 497 F.3d 964 (9th Cir. 2007)..............10

United States v. Maldonado, 215 F.3d 1046 (9th Cir. 2000)..........11

United States v. Moreland, 622 F.3d 1147 (9th Cir. 2010).......13, 14

United States v. Nichols, 464 F.3d 1117 (9th Cir. 2006)............15

United States v. Savage, 67 F.3d 1435 (9th Cir. 1995)..............12

United States v. Treadwell, 593 F.3d 990 (9th Cir. 2010)...........17

**STATUTES**

18 U.S.C. § 1073...................................................10

18 U.S.C. § 1349....................................................4

18 U.S.C. § 3553(a)............................................15, 16

18 U.S.C. § 3663...................................................13

18 U.S.C. § 3663A..................................................13

18 U.S.C. § 3664...............................................13, 14

**OTHER AUTHORITIES**

USSG § 2B1.1..................................................7, 8, 9

USSG § 2X1.1.....................................................7, 8

USSG § 3B1.1..............................................7, 8, 10, 12

USSG § 3C1.1.....................................................8, 10

USSG § 3E1.1........................................................8

USSG §§ 5El.2.......................................................8

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

On September 23, 2019, defendant Lisa Kay Camp pleaded guilty to Count Five of the five-count Indictment in United States v. Lisa Kay Camp, ED CR 18-200-SVW-1, which charges defendant with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. (Dkt. Nos. 80, 88.)  In sum, between 2009 and 2013, defendant owned and operated a fraudulent telemarketing business, whose employees made mass marketing calls to victims with false promises of nonexistent job leads that induced the victims to pay for fraudulent background checks that were never conducted.  Defendant led, organized, and supervised all her co-defendants and other employees of the telemarketing business.  The aggregated amount of monetary loss to victim job seekers incurred by this conspiracy was approximately $2,181,316.42.  For the reasons set forth below, the government recommends a low-end Guidelines sentence of 78 months' imprisonment, a three-year term of supervised release, restitution in the amount of $2,181,316.42, and a mandatory special assessment of $100.

**II.  DEFENDANT'S OFFENSE CONDUCT**

From May 2009 through July 30, 2013, in Riverside County, California, defendant and her co-defendants conspired to commit fraud through the use of a telemarketing business that went by "Contractor Management," "Contracting Crews," "Construction Crews," "Trade Crews," "Contractor 411," "Commercial Crews," "US Tradepros," "US Workmen," "IPower Marketing," and "IPower Marketing and Productions," among others, at different times.  (PSR ¶ 13.)  Defendant and her co-defendants also owned and controlled "Fed Check," a separate company

1

that purported to conduct background checks.  (Id.)  Defendant was the owner and operator of the telemarketing business.  (PSR ¶ 15.)

The telemarketing business defrauded individual victims seeking jobs by making false statements and guarantees, and omitting material information, regarding the telemarketing business's ability and intention to find job leads and work orders.  (PSR ¶ 14.)  The telemarketing business employed salespersons and used an auto-dialer service to contact prospective job seekers.  (PSR ¶ 16.)  Using scripts provided by defendant and her co-defendants, the salespersons made false statements and omitted material information to induce the victim job seekers to pay for background check.  (Id.)  Specifically, under defendant's direction, the telemarketing business, through its websites and salespersons, made the following false statements: telemarketing business had contracts with banks involving bank-owned properties; the telemarketing business or the banks with which it purportedly contracted would provide job leads and work orders to the victim job seekers; and work repairing bank-owned properties was available in each victim job seeker's geographic area.  (PSR ¶ 18.)

Under defendant's direction, the salespersons of the telemarketing business told each victim job seeker that a background check was required before job leads and work orders could be sent-- which a pretext for collecting money from the victim job seekers. (PSR ¶¶ 14, 19.)  The telemarketing business then charged each victim job seeker a fee of $39, $60, or $99 for background check, which could be paid over the telephone or on the Internet via the Fed Check website.  (Id.)  Each victim job seeker was told that if he or she did not pass the background check, the background check fee would be refunded.  (PSR ¶¶ 16, 18.)  The telemarketing business then kept the

2

background check fee, which was deposited into a bank account controlled by the telemarketing business, without conducting a background check or refunding the fee to the victim job seeker. (PSR ¶¶ 16, 19.)  The aggregated amount of monetary loss to victim job seekers over the 4-year period of fraud was approximately $2,181,316.42.  (PSR ¶ 22.)

As noted, defendant was the owner and operator of the telemarketing business.  (PSR ¶ 15.)  She signed the lease agreement for the business location of the telemarketing business in Temecula, California, and used the name "Contractor Management" on the lease. (Id.)  She opened and maintained the telemarketing business's bank accounts that received victim monies, and deposited the victims' checks into the bank accounts and withdraw cash for payroll.  (Id.) Defendant created a sales pitch that contained numerous lies to induce victim job seekers to pay for a fraudulent background check to be performed by Fed Check.  (Id.)  The sales pitch claimed that the telemarketing business had contracts with thirty banks for job leads and work orders when in fact there were no such contracts or affiliation with any financial institutions.  (Id.)  She hired and trained employees of the telemarketing business and supervised all the supervisors (including her co-defendants) and employees of the telemarketing business.  (Id.)  Supervisors of the telemarketing business, under defendant's direction, would lie to new employees about the fraudulent nature of the telemarketing business, but the employees eventually learned that they were defrauding the victim job seekers and identified defendant as the leader/boss of the fraudulent scheme.  (PSR ¶¶ 15, 17.)

**III. THE PRESENTENCE INVESTIGATION REPORT**

On December 16, 2019, the United States Probation Office ("USPO") filed its Presentence Investigation Report ("PSR") in this matter. (Dkt. No. 94.) The USPO determined, in large part in accordance with the parties' plea agreement, that:

1. defendant's United States Sentencing Guidelines ("USSG" or "Guidelines") base offense level is 7 under USSG §§ 2X1.1(a), 2B1.1(a)(1);

2. she is subject to a 16-level enhancement for loss more than $1,500,000 but less than $3,500,000 under § 2B1.1(b)(1)(I); and

3. she is subject to a 2-level enhancement for commission of the offense through mass-marketing under § 2B1.1(b)(2)(A)(ii).[1] (PSR ¶¶ 29-31.)

In addition, the USPO determined that defendant is subject to a 4-level enhancement for being the organizer/leader of the offense scheme involving five or more participants under USSG § 3B1.1(a), on which the parties have not reached an agreement. (PSR ¶¶ 33-35.) The inclusion of this role enhancement resulted in a combined offense level of 29. (PSR ¶ 37.)

After adjusting for a 3-level reduction for acceptance of responsibility, the PSR reached a total offense level of 26. (PSR ¶¶ 39-41.) Defendant has no criminal history, placing her in criminal history category I. (PSR ¶¶ 43-47.) Thus, the USPO identified the applicable Guidelines imprisonment range to be 63 to 78 months (Zone D) and the applicable Guidelines range for a

---

[1] In the plea agreement, the parties agreed to a two-level enhancement under the same Guidelines provision (USSG § 2B1.1(b)(2)(A)(ii)) for ten or more victims.

supervised release term to be 1 to 3 years.  (PSR ¶¶ 80, 82.)  The USPO found defendant to be ineligible for probation because the applicable Guidelines range is in Zone D of the Sentencing Table. (PSR ¶ 85.)  Further, the USPO identified the applicable Guidelines range for the fine as $12,500 to $125,000 pursuant to USSG §§ 5E1.2(c)(3), (h)(1).  (PSR ¶ 88.)  The USPO determined that "[r]estitution shall be ordered, unless the court finds, from facts on the record, that the number of identifiable victims is so large as to make restitution impracticable."  (PSR ¶ 91.)  The USPO did not identify any grounds for a departure or a variance.  (PSR ¶¶ 94, 95.)

In its disclosed sentencing recommendation letter, the USPO recommended the following: 63 months' imprisonment, a three-year term of supervised release, a waiver of all fines due to defendant's inability to pay, no restitution finding due to a large number of identifiable victims to make restitution practicable, and a mandatory special assessment of $100. (Dkt. No. 93.)

## IV. THE GOVERNMENT'S SENTENCING CALCULATIONS AND RECOMMENDATIONS

Concurring in large part with the USPO's calculations, the government's sentencing calculations are as follows:

| | | |
|---|---|---|
| Base Offense Level | 7 | USSG §§ 2X1.1(a), 2B1.1(a)(1) |
| Loss of Over $1.5 million and up to $3.5 million | 16 | USSG § 2B1.1(b)(1)(I) |
| Ten or More Victims | 2 | USSG § 2B1.1(b)(2)(A)(i) |
| Organizer/Leader Role | 4 | USSG § 3B1.1(a) |
| Obstruction of Justice | 2 | USSG § 3C1.1 |
| Acceptance of Responsibility | -3 | USSG § 3E1.1 |
| **Total Offense Level** | **28** | |

With a total offense level of 28 and a criminal history category is I, the applicable Guidelines imprisonment range is 78 to 97 months and the applicable Guidelines range for a supervised release term is 1 to 3 years.

Based on the above calculations and the reasons set forth below, the government respectfully recommends a low-end sentence of 78 months' imprisonment, a three-year term of supervised release, restitution in the amount of $2,181,316.42, and a mandatory special assessment of $100.

### A.   "MORE THAN 10 VICTIMS" ENHANCEMENT

In reaching its recommendation, the government disagrees with the USPO's application of the 2-level enhancement for commission of the offense through mass marketing under USSG § 2B1.1(b)(2)(A)(ii). Instead, as stipulated in the plea agreement, the government asks this Court to find that a 2-level enhancement for "more than 10 victims" under USSG § 2B1.1(b)(2)(A)(i) is appropriate.  While the parties' and the USPO's choices of alternative provisions of § 2B1.1(b)(2)(A) result in the same 2-level enhancement (given that only one of the 2 provisions, but not both, may apply in this case), the government stands by the appropriateness of the parties' agreed-upon Guidelines factor of "more than 10 victims," as "over 3800 victim job seekers have been identified" as of the preparation of the PSR.  (PSR ¶ 22.)

### B.   OBSTRUCTION OF JUSTICE ENHANCEMENT

As the Court is well aware, defendant is currently in fugitive status, having absconded on August 8, 2020 while under pretrial supervision and not responded to communications by her supervising officer with the USPO.  In response, this Court issued a warrant for

6

defendant on August 11, 2020. (Dkt. No. 128; see also Notice of Government's Intent to Proceed With In Absentia Sentencing Hearings[2] (Dkt. No. 135).) In so doing, defendant has not only violated the conditions of her bond that requires her to reside as approved by Pretrial Services and not relocate without permission, but also committed a new crime of fleeing to avoid prosecution, in violation of 18 U.S.C. § 1073, which is another violation of his pretrial release conditions.

Although the December 16, 2019 PSR does not address defendant's absconsion because defendant had not yet fled, the 2-level obstruction of justice enhancement under USSG § 3C1.1 now applies. Under USSG § 3C1.1, defendant's flight and absconsion represent obstruction and impeding of the administration of justice with respect to defendant's sentencing of her offense of conviction. As the commentary to § 3C1.1 identifies, "escaping . . . from custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding" constitutes a "covered conduct" that justifies the increase in offense level by 2 levels. USSG § 3C1.1 cmt. n.3. Accordingly, the Court should apply a 2-level increase of defendant's offense level for obstruction of justice.

C.  **AGGRAVATING ROLE ENHANCEMENT**

The government agrees with the USPO's conclusion that defendant was an organizer or leader in a criminal scheme that involved five or more participants, warranting a 4-level enhancement under USSG § 3B1.1(a). (PSR ¶¶ 33-35.)

---

[2] On the obstruction of justice enhancement, the government incorporates the facts and arguments presented to this Court regarding defendant's flight in the Notice of Government's Intent to Proceed With In Absentia Sentencing Hearings (Dkt. No. 135).

The Ninth Circuit has upheld upward adjustments under § 3B1.1(a) in "'cases involv[ing] defendants who, the evidence showed, exercised some degree of control or organizational authority over others.'" United States v. Garcia, 497 F.3d 964, 969-70 (9th Cir. 2007) (quoting United States v. Avila, 95 F.3d 887, 890 (9th Cir. 1996) (citing cases)). "Such control or authority over others is required to impose the four-level enhancement under § 3B1.1(a), for it is 'precisely what distinguishes a leader or an organizer [under § 3B1.1(a)] from a manager or supervisor' under § 3B1.1(b)." Id. (quoting Avila, 95 F.3d at 890 n.6). An enhancement under §§ 3B1.1(a) or (b) does not require control over all of the five or more participants. See id. "Factors the [sentencing] court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." USSG § 3B1.1 cmt. n.4. The sentencing court may rely on the PSR to find that a defendant was a leader or organizer and that the criminal activity involved five or more participants. See United States v. Maldonado, 215 F.3d 1046, 1051 (9th Cir. 2000).

As noted in the PSR, defendant's scheme involved at least five criminally charged participants (defendant and her four co-defendants) and numerous other criminal participants. (PSR ¶ 34.) Defendant "was the organizer of the offense as well as a leader in the criminal activity," which included her central role in which "she owned and operated the telemarketing business; signed the lease

8

1 agreement for the business location; opened and maintained the
2 telemarketing business's bank accounts and deposited the victims'
3 checks and withdraw cash for payroll from the bank accounts; hired
4 and trained employees of the telemarketing business and supervised
5 all the supervisors (including her co-defendants) and employees of
6 the telemarketing business." (Id.)  As further noted in the PSR,
7 defendant admitted during her post-arrest interview with the USPO
8 that she started "Contractor Management," the fraudulent
9 telemarketing business, and handled the training, along with other
10 people who worked for her.  (PSR ¶ 24.)  Defendant also admitted that
11 she "employed thirty to forty people in total" and "started Fed
12 Check, for which she got a license and bank account."  (Id.)
13     The above facts identified by the USPO amply establish that
14 defendant exercised decision-making authority in the multi-year
15 criminal scheme that defrauded thousands of victims, she was
16 intimately involved with in the commission of the offense, she
17 devised, planned, and organized the core, foundational aspects of the
18 fraudulent scheme and trained others to commit fraud, and she
19 exercised control and authority over other members of the scheme.
20 See USSG § 3B1.1 cmt. 4; United States v. Cefaratti, 221 F.3d 502,
21 516 (9th Cir. 2000) (defendant's instruction of others in fraud is
22 relevant conduct supporting role adjustment in overall scheme).
23 Indeed, defendant was "the moving factor behind the entire scheme."
24 United States v. Savage, 67 F.3d 1435, 1443-44 (9th Cir. 1995)
25 (affirming 4-level enhancement under § 3B1.1(a)).  The Court should
26 credit the USPO's factual determinations in the PSR and find that a
27 4-level enhancement is warranted under USSG § 3B1.1(a) for
28 defendant's organizer or leader role in her wire fraud scheme.

9

### D. STIPULATED RESTITUTION AMOUNT

The government respectfully asks this Court to order restitution that the parties have stipulated in the plea agreement in the amount of approximately $2,181,316.42 at the sentencing hearing.

The government strongly disagrees with the USPO's determination that "the number of identifiable victims is so large as to make restitution impracticable" (Dkt. No. 93.)  That determination, despite the presentation of the list of more than 3,800 victims that the government provided to the USPO prior to the preparation of the PSR, goes against not only the parties' stipulation in the plea agreement that "the applicable amount of restitution is approximately $2,181,316.42" (Dkt. No. 80 at 5), but also the principle of restitution to <u>identifiable victims</u> that animates the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. §§ 3663A, 3664.  Since the disclosure of the PSR, the government has provided an updated list of 4,183 victims to whom restitution is owed.  That updated is being filed under seal as Exhibit 1 to this sentencing and other sentencing memoranda in this case.  (<u>See</u> Notice of Manual Filing and its associated pleadings at Dkt. No. 141.)

The "primary and overarching goal" of the MVRA "is to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being."  <u>United States v. Moreland</u>, 622 F.3d 1147, 1170 (9th Cir. 2010).  Given that the government has now compiled the list of 4,183 identified victim job seekers who were unemployed or underemployed when they were defrauded by defendant's conspiracy and sustained specific financial injuries by defendant and her co-defendants, the Court should order the specific restitution that the parties have

agreed to in the amount of $2,181,316.42 so that the defrauded victims may be made whole.  The statute that governs general orders of restitution provides that the Court "may also order restitution in any criminal case to the extent agreed to by the parties in a plea agreement," 18 U.S.C. § 3663, which is precisely what we have here.

The PSR incorrectly suggests that because the number of victims is high and defendant's future earning potential is low, restitution "appears impractical" (PSR ¶ 76), but that analysis contravenes the text of the MVRA, which directs the USPO to inform the Court "[if] the number or identity of victims cannot be reasonably ascertained, or other circumstances exist that make this [restitution] requirement clearly impracticable."  18 U.S.C. § 3664.  Here, the government has specifically identified 4,183 of defendant's victims, including their names, addresses, and individual loss amounts.  (See Exhibit 1 filed under seal.)  While the process of returning the restitution amounts to individuals may not be easy, it is far from impracticable.  The process will require nothing more than sending letters to the identified victims to provide instructions on reclaiming their losses, which is the same process employed in most other fraud cases involving individual victims in multiple states.  As the Ninth Circuit has noted, "[t]he intended beneficiaries of the MVRA's procedural mechanisms are the victims, not the victimizers." Moreland, 622 F.3d at 1171 (citation and internal quotation marks omitted).  If restitution is not ordered for the 4,183 identified individual victims for the reasons provided by the USPO, it would be defendant and co-defendants, the victimizers, who will become beneficiaries of the MVRA, which cannot be the intent of the MVRA.

11

Accordingly, the Court should order the stipulated restitution amount of $2,181,316.42 at the sentencing hearing.

## V. ARGUMENT

The Court should sentence defendant to a low-end Guidelines sentence of 78 months' imprisonment, a three-year term of supervised release, restitution in the amount of $2,181,316.42, and a special assessment of $100. This sentence is sufficient, but not greater than necessary, to meet the sentencing goals set forth in 18 U.S.C. § 3553(a).[3]

### A. LEGAL STANDARD

While not definitive, the Guidelines range provides the starting point for finding a reasonable sentence and must then be considered with the factors set forth in Section 3553(a). See United States v. Cantrell, 433 F.3d 1296, 1279 (9th Cir. 2006). "To comply with the requirements of Booker, the district court must have sufficiently considered the Guidelines as well as the other factors listed in § 3553(a). This requirement does not necessitate a specific articulation of each factor separately, but rather a showing that the district court considered the statutorily-designated factors in imposing a sentence." United States v. Nichols, 464 F.3d 1117, 1125 (9th Cir. 2006) (citation omitted).

///

---

[3] The discussion in this section of how the § 3553(a) factors apply in this case is meant to support the government's request for a low-end sentence of 78 months' imprisonment, which represents a significant term of imprisonment requiring a correspondingly substantial justification. The government also anticipates that defendant will request a sentence of less than 65 months' imprisonment. Nothing in this sentencing position should be construed as recommending or suggesting that a sentence of more than 78 months is appropriate under the § 3553(a) factors.

**B.     DEFENDANT'S OFFENSE AND PERSONAL HISTORY, § 3553(A)(1)-(2)**

Over more than four years, defendant orchestrated a scheme to defraud tens of thousands of individuals from across the United States and caused more than $2.1 million in aggregated losses from the victims.  (PSR ¶ 22.)  She directed her co-defendants and others in executing the scheme, which deceived unsuspecting unemployed and underemployed members of the public into paying $99 that resulted in no job leads.  Defendant exploited individuals in most vulnerable financial situations who were looking to make an honest living.  Through empty promises of employment opportunities and elaborate processes of fraud, defendant deprived victims of the little money they had.

At the same time, the government notes that defendant has fully accepted responsibility for her offense, and she does not have any criminal history.  Defendant appears to have had a difficult upbringing and challenging mental and physical health history, having been abused multiple times by others she trusted.  (PSR ¶¶ 52-56.)  She continues to suffer from multiple physical ailments that require medical treatment.  (PSR ¶¶ 62-65.)

Upon balancing the seriousness of defendant's offense against the difficulties that defendant has faced and endured, the government believes that the recommended custodial sentence of 78 months at the low end of the applicable Guidelines range is appropriate and just.

**C.     RESPECT FOR THE LAW, PROTECTION OF COMMUNITY, DETERRENCE, AND AVOIDANCE OF UNWARRANTED DISPARITIES, § 3553(A)(3)-(7)**

A low-end sentence of 78 months will also serve to protect the community from further crimes by defendant, afford adequate specific and general deterrence, and promote respect for the law.  Defendant's

13

deployment of an elaborate fraud scheme involving multiple family members and others employees suggests that she has a greatly underdeveloped respect for the law.  Her role in the fraud scheme involved thousands of individual decisions over the course of at least 4 years.  During this period, defendant and her co-defendants were essentially making their living by committing fraud.  Thus, a substantial period of custodial sentence, which the low-end sentence of 78 months would provide, is necessary to protect the community from defendant and promote law and justice.

In addition, the Court should minimize sentencing disparities among similarly-situated defendants by imposing a within-Guidelines low-end sentence.  Using the correctly calculated sentencing guidelines as a starting point for sentencing helps accomplish this goal.  See, e.g., United States v. Treadwell, 593 F.3d 990, 1011-12 (9th Cir. 2010).  Since the government's requested sentence is within the applicable Guidelines range, such a sentence would avoid unwarranted sentencing disparities among similarly-situated defendants.

**V.    CONCLUSION**

The government respectfully recommends that the Court impose a sentence of 78 months' imprisonment, a three-year period of supervised release, restitution in the amount of $2,181,316.42, and a mandatory special assessment of $100.